UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

     Plaintiff,

                                Case No. 18-20237

v.                             Hon. Mark A. Goldsmith

SHAMIMUR RAHMAN,

     Defendant.

_____/

## United States' Combined Response and Brief Opposing the Defendant's Motion for Compassionate Release

The Defendant, Shamimur Rahman, was one of four Michigan pharmacists in a business and criminal partnership who turned a series of small, independent pharmacies into their personal cash cows by billing insurance companies for prescription medications that were never dispensed. Over the course of the conspiracy, and from only the pharmacy at which he was the "pharmacist-in-charge," Rahman overbilled insurance companies – and enriched himself – in excess of $1.6 million. The losses from the other pharmacies involved in the conspiracy totaled millions more. For nearly 5 years, Rahman habitually defrauded the insurance companies and lived off these criminal proceeds. He was prosecuted and pleaded guilty to health care

fraud, in violation of 18 U.S.C. § 1347. On December 19, 2018, he was

sentenced to 57 months' of imprisonment.

Rahman began serving his current sentence in a Bureau of Prisons

facility on February 12, 2019. On April 13, 2020, Rahman petitioned the

Warden at FCI Morgantown, where he is incarcerated, to be

administratively recommended for compassionate release based on his

claimed obesity and chronic obstructive sleep apnea. This petition was

denied on May 5, 2020. He has appealed that decision administratively.

He now moves for compassionate release under 18 U.S.C.

§ 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing

for Covid-19, implementing strict precautions to minimize the virus's

spread in its facilities. Following two recent directives from the

Attorney General, the Bureau of Prisons is also assessing its entire

prison population to determine which inmates face the most risk from

Covid-19, pose the least danger to public safety, and can safely be

granted home confinement. This process necessarily requires the

Bureau of Prisons to identify the best candidates for release, ensure

that their homes are suitable for home confinement, and arrange a way

2

to quarantine each of them for 14 days. As of June 2, 2020, these directives have already resulted in at least 3,545 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Rahman does not satisfy the statutorily mandated criteria for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Rahman's failure to meet the criteria in USSG § 1B1.13 also forecloses relief. Even assuming a defendant facing a heightened risk from Covid-19 might satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Rahman does not have *any* condition that places him at higher risk from Covid-19. And, moreover, BOP's efforts at containing the spread of Covid-19 have succeeded, as of the date of this filing, because there are no confirmed cases of the disease at FCI Morgantown, where Rahman is incarcerated. Additionally, Rahman's offense makes him a danger to the community, which precludes release under USSG § 1B1.13(2), because his medical fraud scheme was a 5 year gross misuse and abuse of his

pharmacist license. He used the license entrusted to him to defraud the health care insurance providers who entrusted him and corrupted the pharmaceutical community. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release for these same reasons.

## Background

Beginning in 2012, Rahman entered into a partnership agreement with two of his co-defendants, Samir Berri and Anthony Cole, to be an owner and operator of an additional pharmacy within a small chain of such stores begun by Berri and Cole. By 2013, very soon after opening the new store, Rahman was committing fraud through the pharmacy. The profits from this activity were split between Rahman and his partner co-defendants. The general scheme was to bill insurance companies, including government programs like Medicare and Medicaid, for high-reimbursement medications. The medications had never been prescribed for a patient and the pharmacy had never bought the medications for resale. This was a scheme of pure profit and pure greed and was a significant breach of the trust placed in pharmacists to bill honestly. Rahman, and his partners, took advantage of a system

that relies heavily on the good faith and honesty of pharmacists so needed medications are available immediately for patients who need them. They engaged in this practice for 5 years and caused almost $6 million in losses to insurance companies. Rahman fraudulently billed nearly $1.6 million out of his pharmacy alone.

Rahman was charged with 11 counts of health care fraud in April 2018. He eventually pleaded guilty to one count of health care fraud and agreed to the relevant conduct of all of the fraud committed through his pharmacy. On December 19, 2018, he was sentenced to a term of 57 months' of imprisonment.

Rahman began serving his prison sentence on February 12, 2019, and is currently incarcerated at FCI Morgantown in West Virginia. He is 43 years old, and his projected release date is February 27, 2022. He has no underlying health conditions that have been recognized by the Centers for Disease Control as risk factors for a severe case of Covid-19. Nevertheless, on April 13, 2020, Rahman petitioned the Warden for a recommendation for administrative compassionate release, citing his elevated Body Mass Index, chronic obstructive sleep apnea, and the Covid-19 pandemic. The request was denied on May 5, 2020. He has

5

appealed that decision administratively. Rahman now also seeks release by this Court for the same reasons presented to the BOP.

## Argument

I.   **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

    A.   **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and

6

inmates are also issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](#).

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained

throughout this disruption, the Bureau of Prisons has increased

inmates' telephone allowance to 500 minutes per month. Legal visits

are permitted on a case-by-case basis after the attorney has been

screened for infection.

Like all other institutions, penal and otherwise, the Bureau of

Prisons has not been able to eliminate the risks from Covid-19

completely, despite its best efforts. But the Bureau of Prisons' measures

will help federal inmates remain protected from Covid-19 and ensure

that they receive any required medical care during these difficult times.

Efforts like these have so far succeeded at FCI Morgantown, because

there are no confirmed cases of Covid-19 at this facility where Rahman

is incarcerated.

### B.   The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing

the placement of federal prisoners in home confinement. New

legislation now temporarily permits the Bureau of Prisons to "lengthen

the maximum amount of time for which [it] is authorized to place a

prisoner in home confinement" during the Covid-19 pandemic.

Coronavirus Aid, Relief, and Economic Security Act (CARES Act)

§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).
The Attorney General has also issued two directives, ordering the
Bureau of Prisons to use the "various statutory authorities to grant
home confinement for inmates seeking transfer in connection with the
ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*
04-03-2020 Directive to BOP, at 1). The directives require the Bureau of
Prisons to identify the inmates most at risk from Covid-19 and "to
consider the totality of circumstances for each individual inmate" in
deciding whether home confinement is appropriate. (03-26-2020
Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. So
far, 3,545 federal inmates have been granted home confinement since
the Covid-19 pandemic began, and that number continues to grow. BOP
Coronavirus FAQs. As the Attorney General's directives have explained,
these home-confinement decisions have required evaluating several
criteria:

> 1) Each inmate's age and vulnerability to Covid-19;
>
> 2) Whether home confinement would increase or decrease
> the inmate's risk of contracting Covid-19; and

3) Whether the inmate's release into home confinement
would risk public safety.

([03-26-2020 Directive to BOP](#); [04-03-2020 Directive to BOP](#)).

These criteria not only make sense, but also fit the realities of the
Covid-19 pandemic far better than any other solution does. The Bureau
of Prisons cannot open its facilities' gates indiscriminately and unleash
tens of thousands of convicted criminals, en masse. It must focus on the
inmates who have the highest risk factors for Covid-19 and are least
likely to engage in new criminal activity. This is true not just to protect
the public generally, but to avoid the risk that a released defendant will
bring Covid-19 back into the jail or prison system if he violates his
terms of release or is caught committing a new crime. *See* 18 U.S.C.
§ 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-
confinement initiative thus appropriately focuses on the inmates who
will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important
consideration: how likely is an inmate to abide by the CDC's social-
distancing protocols or other Covid-19-based restrictions on release?
Many inmates—particularly those who have been convicted of serious
offenses or have a lengthy criminal record—been already proven

10

unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

11

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18-20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II. The Court should deny Rahman's motion for compassionate release.

Rahman's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those

12

statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First,* even where a defendant, such as Rahman, has met the requirements at 18 U.S.C. § 3582(c)(1)(A) of either (1) "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) there has been a "lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," he must still show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Second*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

## A.   There are no extraordinary and compelling reasons to grant Rahman compassionate release.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy

14

statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of

15

the Bureau of Prisons," which the Bureau of Prisons has set forth in

Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth

Circuit recently explained, a district court "lack[s] jurisdiction" to grant

compassionate release when a defendant's circumstances do not fall

within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of

inmate-specific condition permitting compassionate release. The Bureau

of Prisons has worked diligently to implement precautionary measures

reducing the risk from Covid-19 to Rahman and other inmates. Thus, as

the Third Circuit has explained, "the mere existence of Covid-19 in

society and the possibility that it may spread to a particular prison

alone cannot independently justify compassionate release, especially

considering BOP's statutory role, and its extensive and professional

efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. And,

importantly, there are no confirmed cases where Rahman is

incarcerated, so any risk of contraction is attenuated.

Rahman's age and medical condition likewise do not satisfy the

requirements for release in USSG § 1B1.13 cmt. n.1, even when

considered in combination with the Covid-19 pandemic. The Centers for

Disease Control publishes guidance for what demographic and medical criteria may put one at risk of a severe case of Covid-19. *See*

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. A review of Rahman's medical records shows that he has not been diagnosed with *any* of these recognized risk factors for a severe case of Covid-19. *See* Exhibit 1, Medical Records (sealed), pg. 12 ("Health Problems"). And, Rahman is only 43 years old, so he is far younger than the age of 65 noted by the CDC as the age at which an individual's risk of a severe case of Covid-19 is particularly heightened. So whether considered alone or in combination with the Covid-19 pandemic, Rahman's age and medical conditions do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

In his motion to the Court requesting compassionate release, Rahman claims that, at 5'6" tall and 200 lbs., he is obese and cites to the same CDC webpage cited by the government, above, as supportive of his claim that he has a risk factor for a severe case of Covid-19. (Dkt. 152: Rahman Compassionate Release Motion, PgID.897). However,

17

Rahman mischaracterizes the degree of obesity recognized by the CDC as a risk factor. Rahman's Body Mass Index (BMI) is 32.3.[1] This does, indeed, qualify him as "obese." But the CDC, to which Rahman cites, notes that it is those who are *severely* obese, with a BMI of 40 or above, who are at risk for a more severe case of Covid-19.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Rahman's BMI is far below what has been recognized as a risk factor. And, his weight appears to be under control: at the time of the preparation of the PSR in this matter in October 2018, Rahman was 199 lbs. (PSR ¶ 44). According to the weight provided in his motion, he is now only 1 pound heavier at 200 lbs.

Rahman also claims that individuals who are obese may also have underlying conditions, such as hypertension, putting them at risk of complications from Covid-19. But, first, Rahman provides no evidence he has ever been diagnosed with hypertension. In fact, at his most recent physical in the BOP on May 22, 2020, Rahman's blood pressure

---

[1] Calculated from his stated height of 5'6", and 200 lbs., at https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm

measured at 120/80. (Ex. 1: Medical Records, Pg. 1). This reading places Rahman at the very lowest end of "elevated," not hypertensive, blood pressure. https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings. Second, standard hypertension is not noted as a risk factor by the CDC.[2] Indeed, recent research suggests that, while hypertension is often present in patients with severe COVID-19 symptoms, "there is as yet no evidence that hypertension is related to outcomes of COVID-19." (*Hypertension and COVID-19*, American Journal of Hypertension, April 6, 2020, https://academic.oup.com/ajh/article/doi/10.1093/ajh/hpaa057/5816609).

Rahman also points to his chronic obstructive sleep apnea and use of a CPAP machine while he sleeps as a basis for release. He provides no evidence that the condition is a risk factor for a severe case of Covid-19. He claims that the use of such a device could make it easier to *transmit* the virus, but this says nothing about Rahman's relative risk of contraction, or risk of a severe case.

---

[2] Pulmonary hypertension, a specific and distinguishable form of hypertension specific to the lungs and heart, is a recognized risk factor.

Rahman is a young and healthy man. He has no medical condition that is the kind of "extraordinary or compelling" condition that merits compassionate release. Rahman points to numerous cases where compassionate release was granted, but in all of those cases the defendant prisoner suffered from far more significant medical conditions, and often combinations of significant conditions, than Rahman can claim.

Finally, even if the combination of Rahman's medical conditions and the Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Rahman would remain ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d

20

1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent"
offenders—such as those who have been involved in serial or significant
fraud schemes—may not be released under § 3582(c)(1)(A). USSG
§ 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7; *United States v. Reynolds*,
956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases,
encompass pecuniary or economic harm."); *United States v. Israel*, No.
17-20366, 2017 WL 3084374, at *5 (E.D. Mich. July 20, 2017)
(recognizing that "economic harm may qualify as a danger" foreclosing
release).

Adhering to § 1B1.13(2) is especially important given the current
strain on society's first responders and the rise in certain types of crime
during the Covid-19 pandemic. Police departments in many cities have
been stretched to their limits as officers have either contracted Covid-19
or been placed in quarantine. Some cities, including Detroit, have seen
spikes in shootings and murders. Child sex predators have taken
advantage of bored school-aged kids spending more time online. Covid-
19-based fraud schemes have proliferated. There are real risks to public
safety right now, and those risks will only increase if our community is
faced with a sudden influx of convicted defendants.

21

Because Rahman's release would endanger the community,
§ 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A).
Rahman was convicted of engaging in a sophisticated scheme to defraud
for approximately 5 years, which abused the professional trust placed in
him as a licensed pharmacist. He chose to utilize his pharmaceutical
training and license to steal millions of dollars from private sector
insurance companies and Medicare while compromising the integrity of
the pharmaceutical community. He committed these crimes by
affirmatively entering false data seeking reimbursement for
undelivered medications over and over again during this half decade of
criminal activity, despite the risks of detection by insurance companies
and the pharmacy board. Such reoccurring blatant fraud with no regard
for the risks and consequences of detection establish that Rahman is
difficult to deter and, thus, a danger to the community.

Rahman is not eligible for compassionate release.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling
reasons" and demonstrated that he is not dangerous, he is still not
entitled to compassionate release. Before ordering relief, the Court must

consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Rahman eligible for compassionate release, the § 3553(a) factors should still disqualify him.

With respect to the nature and circumstances of the offense, Rahman's criminal activity was not an isolated instance; rather, he engaged in a serious health care fraud conspiracy for five years during which he over and over again submitted false claims for reimbursement to several different entities. He then regularly withdrew the funds that he had illegally obtained to greedily pile on to what was already a respectable income. This scheme worked because Rahman took

23

advantage of the significant amount of trust placed in him as a licensed pharmacist. It was for this reason that, in the calculation of his offense level at the time of sentencing, his offense level was increased based on an abuse of trust. (PSR ¶ 27).

Rahman had many options available to him with which to earn a living without breaking the law. Between 2007 and 2011, prior to partnering with his eventual co-defendants in this matter, he was making more than $9,000 a month working as a staff pharmacist at Rite Aid. (PSR ¶ 55). While it is difficult to know precisely which portion of Rahman's pharmacy work was legitimate during the time frame of the conspiracy (roughly 2013 through Rahman's indictment in April 2018), Rahman reported almost $150,000 in business income for each of the 2015, 2016, and 2017 tax years, as well as a significant amount of additional income each year. (PSR ¶ 56).

Rahman, though, had a significant gambling addiction, as discussed in his sentencing memorandum filed shortly before his December 2018 sentencing in this matter. His gambling habit significantly contributed toward his quest for more money. (Dkt. #82: Rahman Sentencing Memorandum, PgID 285-288). His gambling addiction plagued him for

more than a decade prior to his incarceration. And, it continued even after a 2009 arrest at the Greektown Casino in Detroit after he had been precluded due to heavy losses. (*See* PSR ¶ 34).

Nothing in the Court's analysis of the § 3553 factors has changed since Rahman's sentencing. Rahman broke the law through repeated actions over a period of years; he committed these crimes despite the professional obligations required of him; he declined options to legally make a lucrative income; and he continued with gambling activities that he admits were a reason for committing the instant offense, even after an arrest and serving a term of probation related to that gambling. Rahman's history and characteristics demonstrate that he would be very hard to deter from further criminal activity. The nature of Rahman's offenses are serious, and his history and characteristics establish that he should serve the full term of his 57 months sentence of imprisonment.

## III.   If the Court were to grant Rahman's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Rahman's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Rahman's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ Brant Cook
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9756
brant.cook@usdoj.gov

Dated: June 2, 2020

## Certificate of Service

I certify that on June 2, 2020, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Michigan using the ECF system, which will send notification of the filing to all users of record.

s/ Brant Cook
Assistant U.S. Attorney